**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

TERRELL MCQUEEN,

                              Plaintiff,

        v.

                                                        No. 9:19-CV-998
UNITED STATES OF AMERICA,                                (TJM/CFH)

                              Defendant.

_____

**APPEARANCES:**                            **OF COUNSEL:**

Terrell McQueen
65130-050
Hazelton Federal Correctional Institution
Inmate Mail
P.O. Box 5000
Bruceton Mills, West Virginia, 26525
Plaintiff pro se

Office of United States Attorney          KAREN FOLSTER LESPERANCE, ESQ.
James T. Foley U.S. Courthouse            Assistance United States Attorney
445 Broadway, Room 218
Albany, New York 12207-2924
Attorney for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff pro se Terrell McQueen ("plaintiff"), an inmate currently in the custody of

the Federal Bureau of Prisons ("BOP"), brings this action for medical malpractice under

the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*., against the United

States, alleging that Nurse Practitioner Kimberly Sorrell ("N.P. Sorrell"), who was, at all

---

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

relevant times, employed by the BOP, acted negligently by (1) prescribing plaintiff acne medication without warning him of its potential side effects; and (2) unnecessarily delaying surgical procedures to repair a detached retina in plaintiff's right eye and retinal holes in plaintiff's left eye.  See Dkt. No. 1-2 at 7 ¶ 24; Dkt. No. 1 ("Compl.") at 4, 6.[2] Presently pending before the Court is defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  See Dkt. No. 47.  Plaintiff filed a response in opposition to defendant's motion, see Dkt. No. 56, and defendant filed a reply.  See Dkt. No. 57.  For the reasons that follow, it is recommended that defendant's motion for summary judgment be granted in its entirety and plaintiff's Complaint be dismissed.

## I. Background

The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection III., infra.  At all relevant times, plaintiff was in the custody of the BOP.

### A. Plaintiff's Recitation of the Facts and Causes of Action

Plaintiff states that, on or about November 21, 2016, while incarcerated at Ray Brook Correctional Institution ("Ray Brook"), he visited Health Services, where Nurse Sorrell provided him with medical attention for a recurring breakout of sores on his face

---

[2]  As relevant here, following initial review of plaintiff's Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Senior United States District Court Judge Thomas J. McAvoy dismissed plaintiff's only other claim, pursuant to Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics (403 U.S. 388 (1971)), without prejudice for failure to state a claim.  See Dkt. No. 27 at 9.  Plaintiff did not file an amended pleading in this action.  Therefore, plaintiff's claims for medical malpractice under the Federal Tort Claims Act are the only claims presently pending in this action.

and body.  See Dkt. No. 1-1 at 2 ¶¶ 5, 6.  N.P. Sorrell "noted that [p]laintiff had follicular lesions on his" head, face, and neck, for which she prescribed plaintiff with Sulfamethoxazole/Trimeth 800-160mg.  See id. at ¶ 6.  Plaintiff states that "[t]his was the first time that [N.P.] Sorrell[] had prescribed this medication to [him]."  Id.  Plaintiff contends that N.P. "Sorrell[] did discuss the new medication with [him] but failed to mention any of the dangerous side-effects of th[e] medication."  Id.  On July 7, 2017, plaintiff again visited Health Services at Ray Brook for his "recurrent skin infection," where N.P. Sorrell "prescribed Sulfamethoxazole/Trimeth 800-160mg for the second time."  Id. at 4 ¶ 11.  Plaintiff avers that N.P. "Sorrell[] once again failed to explain to [him] the potential dangerous side-effects which might occur while taking this medication."  Id.

On November 28, 2017, several days after plaintiff fell and hit his head during a basketball game, plaintiff visited Health Services at Ray Brook where Nurse Sorrell provided him with medical attention for "blurred vision."  Dkt. No. 1-1 at 4 ¶ 12.  Plaintiff states that he "initially though he was ok" after falling and hitting his head, but "find[ing] that his vision was blurred to the point he could barely see . . . . [p]rompted him to visit [H]ealth [S]ervices."  Id.  "At this point," plaintiff argues, he "was still unaware that the medication he had been prescribed was capable of causing the vision problems which he was associating to [sic] falling while playing basketball."  Id.  On December 12, 2017, N.P. Sorrell treated plaintiff for "decreased vision after a head contusion."  Id. at ¶ 13.  Plaintiff avers that, N.P. "Sorrell[] stated to [p]laintiff during this visit that in order to save money for Ray Brook, [p]laintiff was going to be reassigned to a CARE 2."  Id.  According to plaintiff, N.P. Sorrell "attempted to justify this reassignment by stating that

3

there [we]re no [o]phthalmologists located at or near Ray Brook." Id.  Plaintiff also alleges that N.P. Sorrel "stated that [p]laintiff needed emergency care for the injury to his eye but did not attempt to locate proper care near Ray Brook." Id.  Plaintiff posits that, in her exam notes, N.P. Sorrell "state[d] that [p]laintiff required further evaluation for decreased vision after head contusion." Id. at 4-5 at ¶ 13.

Plaintiff indicates that, on or about December 12, 2017, he "arrived at Canaan Correctional Institution ("Canaan") where he was not seen again for the ongoing progression of vision loss which [he] was suffering." Dkt. No. 1-1 at ¶ 14.  On or about January 31, 2018, plaintiff was transferred from Canaan to Hazelton Correctional Institution ("Hazelton"), where he engaged in a counseling session with nonparty Physician Assistant Amy Armel ("P.A. Armel") to bring PA Armel "up-to-date on [his] condition." Id. at ¶ 15.  On February 20, 2018, nonparty Jennifer Sommer, O.D. ("Dr. Sommer"), "noted that [p]laintiff was seeing 'floaters' and was seen shortly after injury vitreous hem was noted." Id. at ¶ 16.  Plaintiff states that P.A. Armel "noted that [p]laintinff had a retinal tear with detachment-long standing, and scheduled an off-site examine [sic] be done at West Virginia Eye Institute on [February 21, 2018,] for an emergency consultation and exam," which plaintiff attended on that date. Id. at ¶¶ 16, 17.

On February 26, 2018, plaintiff visited the "Ruby Eye Institute where[] doctors scheduled a vitrectomy posterior with scleral buckle, endo diode laser therapy, placement of silicone oil, indirect retina with diode laser." Dkt. No. 1-1 at 5 ¶ 18. "Plaintiff was . . . scheduled to return the next day for surgery." Id.  On February 27, 2018, plaintiff underwent "bilateral laser surgery for eyes.  Plaintiff had a retinal

detachment of the right eye and left eye retinal hole." Id. at 6 ¶ 19.  Plaintiff states that, as of March 10, 2019, he was "still waiting for the second surgery which he needs in order to fix his other eye.  This is the same eye which [N.P.] Sorrell[] missed during [his] visits to [H]ealth [S]ervices while housed at Raybrook [sic] because [she] was more interested in saving Raybrook [sic] money than she was in getting [him] the proper emergency care . . . he needed." Id. at ¶ 21.

Plaintiff states that, on May 1, 2018, he "filed a Personal Injury/Property Tort Claim form with the Mid-Atlantic Regional Office," which that office received on May 10, 2018.  Dkt. No. 1-1 at 7-8 ¶ 23.  Plaintiff avers that BOP personnel responded to this "Administrative Claim No. TRT-NER-2018-04655 . . . on November 1, 2018," and that he received that response on November 17, 2018.  Id.

Plaintiff contends that N.P. Sorrell's "statement that she was not going to schedule [him] for an emergency visit with an [o]phthamologist in order to save Raybrook [sic] money on their budget, and instead, were going to ship [him] to another institution, constitutes negligence . . . on the part of [N.P.] Sorrell[] . . . ." Dkt. No. 1-1 at ¶ 22.  Further, plaintiff avers that he "would not have suffered long-term damage in his right eye if he had been seen for the emergency consult with the [o]phthalmologist by [N.P.] Sorrell[.]" Id. at 7 ¶ 24.  Moreover, plaintiff states that, because of N.P. Sorrell's decision to transfer him to another correctional institution rather than send him to an ophthalmologist directly from Ray Brook, he "received only one of th[e] much needed [eye] surgeries." Id. at ¶ 25.

Liberally construed, plaintiff asserts causes of action for medical malpractice under the FTCA against defendant based on Nurse Sorrell's alleged negligent acts of

(a) failing to inform plaintiff of the potential side effects of Sulfamethoxazole/Trimeth;

and (b) unnecessarily delaying the surgical procedure to repair a detached retina in

plaintiff's right eye and retinal holes, which resulted in plaintiff suffering "long-term

damage."  Dkt. No. 1-1 at 7 ¶ 24; see Dkt. No. 1 ("Compl.") at 1, 4, 6.

## II. Present Motion

### A. Defendants' Arguments and Evidence in Support of Motion for Summary Judgment

#### 1. Exhaustion of Administrative Remedies

Defendant first contends that, insofar as plaintiff's Complaint may be construed

as asserting a claim for negligent delay in treatment such claim must be dismissed for

failure to exhaust administrative remedies, because plaintiff did not raise that claim in

the administrative claim he filed with the Mid-Atlantic Regional Office on Standard Form

95 ("SF-95").  See Dkt. No. 47-2 at 11-12; see Dkt. No. 47-14 at 1-7.  Defendants note

that a plaintiff may not file a claim against the United States pursuant to the FTCA

"'unless the claimant shall have first presented the claim to the appropriate Federal

agency and his claim shall have been finally denied by the agency.'"  Dkt. No. 47-2 at

11 (quoting 28 U.S.C. § 2675(a)).  Defendants aver that "the only claim presented by

[plaintiff's] SF-95 was the allegation that [Nurse] Sorrell failed to warn him of the side

effects of his acne medication."  Id.

Further, defendants contend that "BOP's tort claim investigation was limited to"

plaintiff's claim that Nurse Sorrell failed to warn him of the side effects of

Sulfamethoxazole/Trimeth DS 800-160mg.  Dkt. No. 47-2 at 11.  In support of this

contention, defendants cite the declaration of Patrick Ward ("Ward"), a Supervisory

Attorney employed by United States Department of Justice, Bureau of Prisons, at the Federal Medical Center in Devens, Massachusetts.  See id.; Dkt. No. 47-13 at 1 ¶ 1. Ward stated that the Mid-Atlantic Regional Counsel's Office received plaintiff's SF-95 administrative tort claim on May 10, 2019, which it then transferred to the Northeast Region, "as the SF-95 alleged claims of negligence at FCI Ray Brook, which is in the Northeast Region."  Dkt. No. 47-13 at 2 ¶ 5.  Ward indicated that the "BOP investigated [plaintiff's administrative tort claim], determined that the treatment received at FCI Ray Brook was in accordance with community standards, and denied the claim by letter dated November 1, 2018."  Id. at ¶ 6.  Upon his own review of the "BOP's tort claim investigation file," Ward stated that "[t]he claim that was received and investigated by BOP was [plaintiff's] allegation that Nurse . . . Sorrell prescribed . . . Sulfamethoxazole/Trimeth DS 800-160mg for treatment of a skin condition, without informing him of the potential side effects of the medication."  Id. at ¶ 7.  Moreover, Ward indicates that "[t]he tort claim investigation was limited to [plaintiff's] claim that he was not advised of medication side effects.  The SF-95 did not allege a negligent delay in treatment, and that claim was not investigated by BOP."  Id. at 3 ¶ 8.  Defendants proffer the BOP's Northeast Regional Office's letter, dated November 1, 2018, denying plaintiff's administrative tort claim (Administrative Claim No. TRT-NER-2018-04655) as exhibit C to Ward's declaration.  See Dkt. No. 47-16 at 2.  Thus, defendants contend, "[b]ecause [plaintiff's] claim of negligent delay in treatment was never presented to the agency, it should be dismissed for lack of subject matter jurisdiction because he failed to exhaust administrative remedies."  Dkt. No. 47-2 at 11-12.

**2. Merits**

Defendants first contend that there is insufficient evidence to support plaintiff's claims of medical malpractice.  See Dkt. No. 47-2 at 12.  Defendant points out that New York medical malpractice law applies to plaintiff's claims brought against the United States pursuant to the FTCA, as the alleged negligence occurred in New York State at Ray Brook.  See id.

**a. Failure to Warn of Side Effects of Sulfamethoxazole/Trimethoprim**

Defendant avers that plaintiff's medical records establish that Nurse Sorrell "discussed the new medication with [him] when she first prescribed Sulfamethoxazole/Trimeth."  Dkt. No. 47-2 at 14.  In support of this contention, defendant proffers plaintiff's BOP Health Services Clinical Encounter form "[c]ompleted by [Nurse Sorrell[]] on 2/29/2016[.]"  See Dkt. No. 49-1 at 3.  The February 29, 2016 medical record indicated that N.P. Sorrell prescribed plaintiff with "Acyclovir" to treat a "human herpesvirus infection," and "Sulfamethoxazole/Trimeth DS 800-160 Mg" to treat "local infections of skin and subcutan tissue."  Id.  N.P. Sorrell stated, in relevant part, "[d]iscussed new medication," plaintiff "verbalize[d] [u]nderstanding" with respect to each medication prescribed and with respect to the "plan of care."  Id.

Defendant also cites to N.P. Sorrell's declaration, see Dkt. No. 47-2 at 14, in which she acknowledged that she does not specifically recall her discussion with plaintiff on February 29, 2016, but that "it is [her] custom and practice when discussing a new medication with a patient to explain what the medication is intended to treat, how it should be used, and any potential side effects."  Dkt. No. 47-11 at 1-2 ¶ 3.  N.P. Sorrell

8

further stated that she "ha[s] no reason to believe that [she] did not follow [her] usual

practice in this case." Id. N.P. Sorrel noted that "BOP's [informational] handout on

Bactrim[3] is attached" to her declaration, and that "[i]t is also [her] custom and practice to

provide an informational handout regarding a medication to a patient when one is

available." Id. at ¶ 4. N.P. Sorrell stated that she "do[es] not have any reason to

believe that [she] did not provide this handout to [plaintiff] when [she] prescribed the

medication, in accordance with her usual practice." Id. at 2 ¶ 4. As N.P. Sorrell stated,

the BOP information handout for Bactrim, titled "Bactrim Side Effects in Detail –

Drugs.com," provides, in relevant part, that there is a "[v]ery rare (less than 0.01%)"

chance of an "[o]cular" side effect known as "Uveitis." Dkt. No. 49-2 at 3. N.P. Sorrel

explained that uveitis "is an inflammation of the middle layer of the eye." Dkt. No. 47-11

at 2 ¶ 4. N.P. Sorrell states that plaintiff's "BOP medical records do not indicate that he

had any problems with the medication, nor did he report to [her] at any time that he was

having any side effects." Id. at ¶ 5.

Moreover, defendant argues, even if N.P. Sorrell failed to inform plaintiff of the

possible side effects of Sulfamethoxazole/Trimeth, "there is no evidence that her failure

to do so resulted in injury to him." Dkt. No. 47-2 at 15. In particular, defendant

observes that plaintiff has not proffered any expert testimony to establish that this

medication caused his retinal detachment or retinal holes. See id. Defendants also cite

the declaration and report of government-retained physician, Aaron Kassoff, M.D. ("Dr.

---

[3] Bactrim is one of several brand-names for the prescription drug consisting of a combination of the antibiotics Sulfamethoxazole and Trimethoprim, which is used to "eliminat[e] the bacteria that cause many kinds of infections." Drugs and Supplements, Sulfamethoxazole And Trimethoprim (Oral Route), Mayo Clinic [last accessed June 22, 2021], https://www.mayoclinic.org/drugs-supplements/sulfamethoxazole-and-trimethoprim-oral-route/description/drg-20071899.

Kassoff"), a retired ophthalmologist.  See id. (citing Dkt. No. 47-17 at 1 ¶ 1; Dkt. No. 47-19 at 2-4).  Upon a review of plaintiff's medical records from 2016 through January 2020, and his WVU Eye Institute records from February 2018-May 2019, Dr. Kassoff opined that, "within a reasonable degree of medical certainty based on [his] review of the relevant records, as well as [his] knowledge, experience, education and training as an Ophthalmologist," that plaintiff's "retinal detachment was unrelated to [Sulfamethoxazole/Trimeth]."  Dkt. No. 47-17 at 1-2 ¶¶ 3, 4.  Dr. Kassoff opined that "[t]here is no support in the medical literature that . . . Sulfamethoxazole/Trimeth 800-160 can cause or contribute to a retinal detachment, nor that individuals who are taking or have taken this medication are more susceptible to retinal detachment."  Id. at 2 ¶ 4.  Rather, Dr. Kassoff opined, "[i]t is most likely that, as indicated by the multiple retinal breaks in the left eye, that [plaintiff] had pre-existing retinal holes in both eyes, and that at the time of the blow to the head, the sudden displacement of the vitreous body (the gel that fills the interior of the posterior segment of the eye and sits against the retina), caused traction at these pre-existing tears, leading to the detachment."  Dkt. No. 47-19 at 4.

**b. Delay in Treatment**

Defendant observes that, "[t]o prevail on his claim that [N.P.] Sorrell negligently delayed care causing injury, [plaintiff] would need to establish the standard of care for a nurse practitioner in a prison setting, that [N.P.] Sorrell deviated from this standard of care, and that the deviation caused an injury."  Dkt. No. 47-2 at 15.  However, defendant notes, "[p]laintiff has not served an expert disclosure nor proffered any medical

testimony to establish any of the elements of his claim, and the discovery deadline has passed." Id.  In particular, defendant notes that, although plaintiff contends that N.P. Sorrell was negligent for designating him a care level two in order to transfer him to Hazelton instead of finding emergency medical care near Ray Brook, plaintiff has not provided any expert opinion concerning the standard of care for a nurse practitioner in such a situation, or that N.P. Sorrell's actions deviated from that standard of care.  See id. at 16.  Defendant also points to N.P. Sorrell's declaration in which she explains that "Ray Brook is designated as a care level one facility, and as such has limited access to specialists or specialized care."  Dkt. No. 47-11 at 3 ¶ 12.  N.P. Sorrell further states that she made the determination to re-designate plaintiff to a medical care level two because "there is no ophthalmologist near Ray Brook that will agree to see federal inmates.  As such, [plaintiff] needed to have his medical care level increased so that he could be moved to a BOP facility that had access to the specialists he needed."  Id.  Defendants submit N.P. Sorrell's December 12, 2017 BOP "Health Services Clinical Encounter – Administrative Note," in which she indicated that plaintiff "require[d] further evaluation for decreased vision after head contusion.  There is no Ophthalmologist at or near [Ray Brook].  CARE 2."  Dkt. No. 49-10 at 2.  Defendants also proffer the December 19, 2017, Ray Brook transfer request form, which indicates that Ray Brook personnel requested plaintiff's transfer based on the "increase in [his] medical care level" to care level two.  Dkt. No. 47-8 at 2.

In addition, defendant argues that, aside from plaintiff's conclusory allegations, the summary judgment record is devoid of evidence to support plaintiff's contention that, but for the delay between the onset of plaintiff's ocular symptoms and the surgery to

11

repair the detached retina in his right eye, he would not have suffered long-term damage to his right eye.  See Dkt. No. 47-2 at 16.  Defendants cite Dr. Kassoff's medical report in which he opined that "there is no evidence in the medical record to suggest that, if the surgery to reattach [plaintiff's] retina had occurred sooner, that a better outcome in terms of restoration of vision would have been achieved."  Dkt. No. 47-17 at 2 ¶ 5.  Relying on N.P. Sorrell's report, Dr. Kassoff observed that, on November 25, 2017, plaintiff hit his head in the right temple area and, on November 28, 2017, reported vision problems in his right eye to N.P. Sorrell.  See Dkt. No. 47-19 at 2. Defendants proffer the November 28, 2017 BOP Health Services Clinical Encounter form completed by N.P. Sorrell in which plaintiff provided the following reason for his sick call visit: "I played basketball on 11-25-17 and my head hit the floor and my right eye is hard for me to see."  Dkt. No. 49-5 at 2.  N.P. Sorrell also indicated that, "[a]ctually[, plaintiff] hit the right temple area on the floor."  Id.  N.P. Sorrell performed a visual screen exam on November 28, 2017, and recorded her findings as follows: 20/HM (Hand Motion) in the right eye and 20/20 in the left eye.  See id.  Dr. Kassoff explains that the notation "HM" contained in N.P. Sorrell's finding of 20/HM stands for "hand motion," and is a measure of visual acuity that indicates that "the individual can identify whether the examiner is moving his hand up and down or side to side."  Dkt. No. 47-19 at 2 n. 1.

Further, Dr. Kassoff observed that, on December 7, 2017, M. Maxon, O.D. ("Dr. Maxon") examined plaintiff, recorded an unrefracted acuity of 20/70 in the right eye and 20/20 in the left eye, and diagnosed plaintiff with "vitreous detachment w[ith] resolving vitreous hemorrhage."  Dkt. No. 49-7 at 2 (Dr. Maxon's Dec. 7, 2017 exam notes); see

Dkt. No. 47-19 at 2. Dr. Kassoff also noted that, in a follow-up examination on

December 11, 2017,[4] Dr. Maxon observed that plaintiff had a visual acuity of "20/200 +

20/100 variable" in his right eye, a visual acuity of 20/20 in his left eye, noted that

plaintiff had decreased "visual acuity [in his right] eye following trauma 3-4 weeks." Dkt.

No. 49-9 at 2; see Dkt. No. 47-19 at 2-3. Dr. Kassoff also noted that, on February 20,

2018, Dr. Sommer conducted an optometry exam of plaintiff and recorded the following

visual screening findings: 20/200 acuity in the right eye, unimprovable with refraction;

20/20 acuity in the left eye. See Dkt. No. 47-19 at 2-3; Dkt. No. 48-6 at 2 (Dr. Sommer's

BOP Health Services Clinical Encounter report, dated Feb. 20, 2018). Dr. Sommer

assessed plaintiff as having a "right, retinal tear with subretinal fluid/detachment," and

stated that she would "send [plaintiff] to WVU ophtho tomorrow for eval/treatment." Dkt.

No. 48-6 at 3. In addition, defendants proffer plaintiff's February 21, 2018 progress

note, drafted by Daniel Dae Kim, M.D. ("Dr. Kim") at the West Virginia Eye Institute, in

which Dr. Kim noted that plaintiff indicated that he was "sometimes . . . seeing flashes of

light and floaters[,]" "denie[d] eye pain and headaches[,]" "sa[id] he [wa]s having

extreme blurry vision and deni[ed] diplopia." Dkt. No. 48-8 at 2. Dr. Kim assessed

plaintiff as having retinal holes in both eyes, and a retinal detachment in the right eye.

See id. at 3. Dr. Kim also indicated that plaintiff's "mac" was "off." Id. at 4.

Dr. Kassoff noted that, on February 26, 2018, plaintiff underwent a surgical

procedure that included re-attachment of his detached retina in his right eye, and

prophylactic laser photocoagulation to seal the retinal breaks in his left eye, and opined

that plaintiff's "post-operative course was uncomplicated with the retina attached in the

---

[4] Dr. Kossoff's expert report erroneously indicates that the date of plaintiff's follow-up examination was December 12, instead of December 11, 2017. See Dkt. No. 47-19 at 3; Dkt. No. 49-9 at 2.

right eye.  <u>See</u> Dkt. No. 47-19 at 3.  Dr. Kassoff also observed that, "[a]t his last recorded visit, on May 21, 2019, [plaintiff's] unrefracted visual acuity was 20/80 in the right eye and 20/20 in the left.  The retina was attached in each eye and laser scars were present bilaterally at the retinal tears."  Dkt. No. 47-19 at 3; <u>see</u> Dkt. No. 48-11 at 4, 5.  At his May 21, 2019 evaluation, plaintiff was observed as "doing well," and indicated that his "vision [wa]s getting better but [was] still blurred."  <u>Id.</u> at 2, 4.

Based on the foregoing record evidence and his own knowledge and experience, Dr. Kassoff opines that "there is no indication that the delay in having the surgery . . . affected the visual outcome . . . ."  Dkt. No. 47-19 at 4.  Further, Dr. Kossoff stated that the first "surgery was successful with post-operative evaluation revealing a fully attached retina including the macula[,]" which "was confirmed at the time of the second surgery on May 13, 2019."  <u>Id.</u>  In addition, Dr. Kassoff opined that "[i]t is possible and not at all unlikely that the acuity in the right eye might be improved with a refraction[,]" but plaintiff's medical records do not contain "[f]ormal visual field testing" that would indicate "whether there is a permanent loss of function corresponding to the area of retinal detachment."  <u>Id.</u>

## B. Plaintiff's Response in Opposition

Plaintiff first argues that summary judgment is inapplicable to the present case and that defendant has failed to acknowledge <u>Millbrook v. United States</u> (596 U.S. 50 (2013)).  <u>See</u> Dkt. No. 56 at 1.  Further, quoting 28 U.S.C. § 2680, plaintiff avers that, "[o]bviously, the [BOP] has a duty to keep its inmates safe and provide a safe invironment [sic]"; therefore, plaintiff contends, defendant's "jurisdictional argument . . .

does not apply." Id. at 1, 2. Plaintiff's reference to defendant's "jurisdictional argument" appears to be directed at defendant's contention that plaintiff failed to exhaust administrative remedies with respect to his delay in treatment claim. Moreover, plaintiff states that "the BOP shall 'provide for the protection . . . of all persons charged with or convicted of offenses against the United States." Dkt. No. 56 at 2 (quoting 18 U.S.C. § 4042(a)(3)). Liberally construed, plaintiff seems to contend that defendant violated this provision of the United States Code insofar as N.P. Sorrell allegedly acted negligently by delaying his treatment. See id.

Further, plaintiff argues that defendant's evidence, including Dr. Kossoff's report and declaration and N.P. Sorrell's declaration, consist of "self-serving bald assertions" and "pure speculation" insofar as Dr. Kossiff opines that the medical evidence does not establish that the delay in plaintiff's surgery caused injury. Dkt. No. 56 at 3. Plaintiff asserts that a conflict of interest exists that requires the Court to "order additional outside medical expertise on this issue," because if the "Court find[s] that prompt medical attention would have saved [plaintiff's] vision, these 'specialists' would be liable." Id. In addition, plaintiff contends that "the BOP has a common practice of not providing any information regarding the side-effects of the medications it provides to inmates[,]" which he avers is evidenced by the purported lack of information BOP personnel at Hazelton provided him concerning the Covid-19 vaccine. Id. at 4. Plaintiff also posits that defendant has failed to meet its burden that no genuine issue of fact exists concerning whether N.P. Sorrell informed him of the side effects of Sulfamethoxazole/Trimethoprim based on the statements contained in her declaration that it was her usual custom and practice to discuss new medications, including side

15

effects with patients.  See id.  However, plaintiff points out that N.P. Sorrell

acknowledged that she did not recall the precise conversation she had with plaintiff

concerning the side effects of Sulfamethoxazole/Trimethoprim.  See id.

### C. Defendant's Reply

Defendant first contends that the Court should deem true the facts provided in its

statement of material facts submitted pursuant to Local Rule 56.1(b) for plaintiff's failure

to respond, despite being warned of the consequences.  See Dkt. No. 57 at 2.  Next,

defendant argues that it is entitled to summary judgment because plaintiff has failed to

provide expert testimony in opposition to its motion.  See id. at 3.  Defendant notes that,

although "[p]laintiff was free to retain a medical expert, as [d]efendant did, to provide

medical opinions in support of [his] claims[,] [h]e failed to do so."  Id. at 4.  Further,

defendant points out that plaintiff does not cite any authority for his assertion that the

Court should order additional expert medical evaluation, and controverts plaintiff's

characterization of its medical expert's declaration.  See id.  Moreover, defendant avers

that, although the basis of plaintiff's reliance on 18 U.S.C. § 4042 is unclear, to the

extent that he contends that section 4042 absolves him of the requirement to provide

expert testimony, courts have routinely rejected this argument in the context of medical

malpractice claims under the [FTCA]."  Id. (citations omitted).

Defendant also avers that plaintiff's reliance on his Hazelton's purported failure to

provide information concerning the side effects of the Covid-19 vaccination to establish

that the BOP has a "common practice" of failing to provide inmates medication side

effect information is misplaced.  See Dkt. No. 57 at 5.  Defendant argues that plaintiff's

16

memorandum in opposition does not constitute evidence and, in any event, his

allegations in this respect are irrelevant to the claims asserted in the present action.

See id.  Moreover, defendant argues that, although plaintiff notes that N.P. Sorrell's

declaration indicates that she did not recall her conversation with plaintiff about the side

effects of Sulfamethoxazole/Trimethoprim, plaintiff "ignores the fact that she

contemporaneously documented in the medical record that she had a conversation with

him about the medication" and "offers no evidence to rebut [d]efendant's expert

testimony opining that the medication did not cause [p]laintiff's eye injury."  Id.

In addition, defendant argues that plaintiff's reliance on Milbrook is misplaced, as

that case concerns "the scope of the law enforcement proviso to the intentional torts

exception to the FTCA, which is not at issue in this case."  See Dkt. No. 57 at 5-6.

Similarly, defendant contends that plaintiff's reliance on 28 U.S.C. § 2680—the

discretionary function exception to the FTCA—is misplaced, because that exception is

not at issue in, or relevant to, this case and, in any event, provides an exception to, not

basis for, the government's liability.  See id. at 6.


### III. Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted

only if all the submissions taken together "show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 247 (1986).  The moving party has the burden of showing the

absence of a genuine dispute of material fact by providing the Court with portions of

"pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion.  Celotex, 477 U.S. at 322; see FED. R. CIV. P. 56(c).  A fact is material if it "might affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial."  Id. at 248, 250; see Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts,"  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp. (Motors Holding Div.), 758 F.2d 839, 840 (2d Cir. 1985) (per curium)).  Furthermore, "mere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (brackets omitted) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest.  At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a court is obligated to construe his pleadings liberally." (internal quotation marks and citations omitted)).

### IV. Discussion[5]

"The United States, as a sovereign, is immune from suit save as it consents to be sued . . ., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."  United States v. Mitchell, 445 U.S. 535, 538 (1980) (internal quotation marks and citation omitted).  "A waiver of sovereign immunity cannot be implied but must be unequivocally expressed."  Id. (internal quotation marks and

---

[5]  All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

citation omitted).  The FTCA, 28 U.S.C. §§ 2671 *et seq*., waives sovereign immunity for "claims against the United States, for money damages . . . for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."  28 U.S.C. § 1346(b).  "[B]ecause the FTCA constitutes a waiver of sovereign immunity, the procedures set forth in [28 U.S.C. §] 2675 must be adhered to strictly."  Keene Corp. v. United States, 700 F.2d 836, 841 (2d Cir. 1983).

### A. Exhaustion of Administrative Remedies

The waiver of sovereign immunity provided under the FTCA "operates subject to numerous conditions, each of which must be satisfied for a court to exercise jurisdiction."  Adeleke v. United States, 355 F.3d 144, 153 (2d Cir. 2004).  For instance, the "waiver is limited to circumstances where the plaintiff 'first presented the claim to the appropriate Federal agency' and the agency either made a final denial of the claim or failed to make a disposition on the claim within six months after it was filed."  Robinson v. Knibbs, No. 16-CV-03826 (NSR), 2019 WL 2578240, at *7 (S.D.N.Y. June 24, 2019) (quoting 28 U.S.C. § 2675(a)); see McNeil v. United States, 508 U.S. 106, 113 (1993) ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies.").  "Th[e] procedural hurdle [to establish exhaustion] applies equally to litigants with counsel and to those proceeding *pro se*."  Robinson, 2019 WL 2578240, at *7 (quoting Adeleke, 355 F.3d at 153); see McNeil, 508 U.S. at 113 ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel.").

Here, defendant contends that plaintiff failed to exhaust his administrative remedies with respect to his claim for negligent delay in treatment by failing to include that claim in his SF-95.  See Dkt. No. 47-2 at 11-12.  In his SF-95, plaintiff noted that, on December 12, 2017, N.P. Sorrell examined him and concluded that he "require[d] further evaluation for decreased vision after head contusion[,]" but that "[t]here is no Ophthalmologist at or near [Rey Brook]." Dkt. No. 47-14 at 4.  Plaintiff further stated that he "was told at this visit that [he] was going to an outside hospital but instead, Health Services said they were transferring [him] to a Care Level II [facility] because [Rey Brook] would save money." Dkt. No. 47-14 at 4.  Plaintiff then contends that, "[i]f [he] had been seen immediately at the hospital near Rey[ Brook], as the doctor had ordered, there is a possibility that [his] left eye could have been saved and the damage prevented altogether." Id. at 5.  Moreover, the BOP's decision denying plaintiff's administrative tort claim observes that plaintiff was "reclassified as a Care Level II inmate, and a transfer was recommended so [he] could be at an institution in an area that was in closer proximity to an ophthalmologist[,]" "[b]ased on [Dr. Sommer's] evaluation" that "further testing was required." Dkt. No. 47-16 at 3.  The BOP decision then states, "[t]here is no evidence [plaintiff] suffered a compensable physical injury as a result of negligence by a [BOP] employee.  Accordingly, your claim is denied." Id.

The undersigned concludes that defendant is correct that plaintiff failed to exhaust his administrative remedies with respect to his administrative claim for negligent delay in treatment.  Although plaintiff alleged in his SF-95 that "[i]f [he] had been seen immediately at the hospital near Rey[ Brook], as the doctor had ordered, there is a possibility that [his] left eye could have been saved and the damage

prevented altogether[,]"  Dkt. No. 47-14 at 5 (emphasis added), plaintiff's negligent delay in treatment claim, as asserted in the present matter, relates to the allegedly negligently delayed retinal reattachment surgery for his <u>right</u> eye, and the purported long-term damage concerns the visual acuity of plaintiff's <u>right</u> eye.  Dkt. No. 1-1 at 7 ¶ 24 ("Plaintiff would not have suffered long-term damage in his <u>right</u> eye if he had been seen for the emergency consult with the [o]phthalmologist by [N.P.] Sorrell[.]" (emphasis added)).  Thus, based on the foregoing, the undersigned concludes that plaintiff failed to exhaust his administrative remedies with respect to his medical malpractice claim based on negligent delay in treatment, such that this Court lacks jurisdiction to adjudicate the merits of that claims.  <u>See</u> 28 U.S.C. § 2675(a); <u>McNeil</u>, 508 U.S. at 113; <u>Robinson</u>, 2019 WL 2578240, at *7.  Accordingly, the undersigned recommends that plaintiff's medical malpractice claim based on negligent delay in treatment be dismissed for failure to exhaust administrative remedies.

## B. Merits

"The liability of the federal government under the FTCA is generally determined by state law."  <u>Mortise v. United States</u>, 102 F.3d 693, 696 (2d Cir. 1996); <u>see</u> <u>Malzof v. United States</u>, 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law").  Accordingly, as the acts or alleged omissions giving rise to plaintiff's claims occurred in Ray Brook, New York, New York substantive law applies.  <u>See Castro v. United States</u>, 34 F.3d 106, 110 (2d Cir. 1994) ("With respect to tort claims as to which the United States has waived its

sovereign immunity, the FTCA requires the court to apply the substantive law of the place where the event occurred." (citing 28 U.S.C. § 1346(b)).

Here, plaintiff's Complaint framed his claims in terms of "negligence." Dkt. No. 1-2 at 7 ¶ 24; Compl. at 4, 6. The Court's September 5, 2019 Decision and Order on initial review of plaintiff's Complaint pursuant 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) noted that plaintiff claimed, as relevant here, "that his injuries [we]re the result of negligence." Dkt. No. 27 at 5, 6. Although the Court observed that "[t]ort claims, such as claims of medical malpractice, are actionable under the FTCA[,]" the Court referred to the claims only as "[p]laintiff's FTCA claim." Id. at 6. Indeed, defendant's Answer—which defendant filed after the Court's Decision and Order on initial review— also framed plaintiff's claims as "Negligence" and "Failure to Act or Perform Duty in Emergency Situation." Dkt. No. 32 at 2. Defendant characterized plaintiff's FTCA claims as claims of medical malpractice for the first time in its motion for summary judgment. See Dkt. No. 47-2 at 3, 12-13. Thus, although plaintiff does not dispute defendant's characterization of his claims relating to N.P. Sorrell's actions as claims sounding in medical malpractice, see Dkt. No. 56 at 1-6, in light of the undersigned's obligation to construe plaintiff's pro se pleadings liberally, the undersigned will engage in a thorough analysis of the nature of these claims.

In New York, "[a]n action to recover for personal injuries . . . against a medical practitioner or a medical facility or hospital may be based either on negligence principles or on the more particularized medical malpractice standard." Friedmann v. New York Hosp.-Cornell Med. Ctr., 65 A.D.3d 850, 851, 884 N.Y.S.2d 733, 734 (N.Y. App. Div. 1st Dept. 2009). The New York State Court of Appeals has noted that, "the distinction

between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence and 'no rigid analytical line separates the two.'" <u>Weiner v. Lenox Hill Hosp.</u>, 88 N.Y.2d 784, 787, 650 N.Y.S.2d 629, 673 N.E.2d 914 (N.Y. 1996), quoting <u>Scott v. Uljanov</u>, 74 N.Y.2d 673, 674, 543 N.Y.S.2d 369, 541 N.E.2d 398 (N.Y. 1989).  In general, "to prevail in a medical malpractice claim in New York . . ., a plaintiff must establish '(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries.'" <u>Vale v. United States</u>, 673 F. App'x 114, 116 (2d Cir. 2016) (summary order) (quoting <u>Arkin v. Gittleson</u>, 32 F.3d 658, 664 (2d Cir. 1994) (internal citation omitted).  New York law requires that a plaintiff establish both of these elements through "'expert medical opinion evidence,'" "'except as to matters within the ordinary experience and knowledge of laymen[.]'" <u>Milano by Milano v. Freed</u>, 64 F.3d 91, 95 (2d Cir. 1995) (quoting <u>Fiore v. Galang</u>, 64 N.Y.2d 999, 1001, 478 N.E.2d 188, 189 (N.Y. 1985)).

New York also allows plaintiffs to pursue a cause of action for medical malpractice based on a lack of informed consent.

> To prevail on a cause of action for malpractice based on lack of informed consent, a plaintiff must establish that[:]
>
> (1) the defendant failed to disclose the reasonably foreseeable risks associated with the treatment or procedure and/or alternatives thereto that a reasonable practitioner would have disclosed under the circumstances[;]
>
> (2) a reasonable, fully informed person in the plaintiff's position would not have undergone the treatment or procedure[;] and
>
> (3) the lack of informed consent is a proximate cause of the injury or condition which, in actuality, is satisfied

24

> by demonstration that the treatment or procedure was
> a proximate cause of the injury or condition.

Santilli v. CHP Inc., 274 A.D.2d 905, 907, 711 N.Y.S.2d 249 (2000) (spacing added)

(citation omitted); see I.M. v. United States, 362 F. Supp. 3d 161, 203 (S.D.N.Y. 2019)

("A plaintiff must also prove that the lack of informed consent is a proximate cause of

the injury or condition for which recovery is sought.").  "As with other types of

malpractice, expert testimony is required to prove these elements."  Moore v. Shahine,

No. 18-CV-463 (AT/KNF), 2021 WL 827694, at *5 (S.D.N.Y. Mar. 4, 2021); see Smith v.

Masterson, 353 F. App'x 505, 508 (2d Cir. 2009) (summary order) ("Expert testimony is

required even when a medical malpractice action is based on lack of informed consent."

(citation omitted)) (summary order)).

### 1. Medical Malpractice—Lack of Informed Consent

As an initial matter, the undersigned concludes that plaintiff's first claim,

premised on N.P. Sorrell's alleged failure to disclose the potential side effects of Bactrin,

is properly considered as a claim sounding in medical malpractice, because "the

challenged conduct 'constitutes medical treatment [and] bears a substantial relationship

to the rendition of medical treatment by a licensed [medical professional].'"  Weiner, 88

N.Y. at 788 (quoting Bleiler v. Bodnar, 65 N.Y.2d 65, 72, 489 N.Y.S.2d 885, 479 N.E.2d

230 (N.Y. 1985).  In particular, affording plaintiff's pro se pleadings the most liberal

construction possible, as the undersigned must, plaintiff alleges a medical malpractice

claim premised on lack of informed consent.  See Muchler v. Penwarden, 207 A.D.2d

977, 617 N.Y.S.2d 87, 87 (N.Y. App. Div. 1994) ("The allegation that [the] defendant

failed to inform [the] plaintiff of the risks associated with the use of the prescribed

medications . . . could support [the] plaintiff's right to recover for medical malpractice based on a lack of informed consent.").  However, as defendant aptly points out, "[p]laintiff has not served an expert disclosure nor proffered any medical testimony to establish any of the elements of his claim, and the discovery deadline has passed." Dkt. No. 47-2 at 15.  Indeed, aside from plaintiff's own conclusory assertions, he proffers no evidence—much less expert evidence—suggesting that N.P. Sorrell's decision to treat his acne with Sulfamethoxazole/Trimeth constituted a departure from accepted standards of medical care, or that the information concerning Sulfamethoxazole/Trimeth N.P. Sorrel provided to plaintiff was insufficient.  See I.M., 362 F. Supp. 3d at 204 ("Expert medical [opinion] is required to prove the insufficiency of the information disclosed to the plaintiff." (quoting Orphan, 940 N.E.2d at 556)). Moreover, defendant has submitted expert medical opinion evidence establishing that there was no medical basis for deeming that N.P. Sorrell's prescription of Sulfamethoxazole/Trimeth was the proximate cause of plaintiff's detached retina or retinal holes, which plaintiff has failed to controvert with admissible evidence.  See Dkt. No. 47-19 at 3.  Thus, the undersigned concludes that defendant is entitled to summary judgment dismissing plaintiff's claim for medical malpractice based on N.P. Sorrell's alleged failure to inform him of potential side effects of Sulfamethoxazole/Trimeth.  See I.M., 362 F. Supp. 3d at 204; Orphan, 940 N.E.2d at 556; see also Ross v. United States, No. 1:15-CV-1094 (MAD/CFH), 2018 WL 1870470, at *4 (N.D.N.Y. Apr. 17, 2018) ("The Court recognizes that [the p]laintiff is appearing *pro se*, but this does not excuse her failure to procure expert medical testimony to support her [medical malpractice claim.").

## 2. Medical Malpractice—Negligent Delay in Treatment

The undersigned concludes that plaintiff's contention that N.P. Sorrell negligently delayed the surgery to repair the detached retina in his right eye is accurately characterized as a claim of medical malpractice.  This Court has held that, "[u]nder New York [l]aw, . . . a claim of negligent delay in treatment [brought pursuant to the FTCA] can support a claim for medical malpractice."  Watts v. U.S. Fed. Bureau of Prisons, No. 07-CV-773 (DNH), 2009 WL 81285, at *9 (N.D.N.Y. Jan. 9, 2009); see Skyers v. Sommer, No. 12-CV-3432 (RWS), 2016 WL 4484241, at *7 (S.D.N.Y. Aug. 23, 2016) (construing the plaintiff's tort claim based on the alleged delay in treatment "as asserting a claim for medical malpractice, because the allegations substantially relate to medical treatment.").  For instance, in Watts, the Court concluded that the "[p]laintiff's claim of negligence [which was] directed toward the delay of prison officials at . . . Ray Brook to address [his] finger injury[,]" alleged a claim of medical malpractice under New York law. Watts, 2009 WL 81285, at *9.  There, the Court observed that, in opposition to the defendants' motion for summary judgment, the plaintiff "failed to adduce or point to any evidence already in the record to suggest that the delay in affording him treatment . . . failed to meet community standards."  Id.  Therefore, the Court reasoned, "[i]n light of th[e] lack of evidence from which a reasonable factfinder cold conclude that the delay in treating his finger condition either caused [a] deformity or required a more invasive surgical procedure . . .," the "plaintiff's claim that the delay in providing treatment was negligent [wa]s subject to dismissal."  Id.

In the present matter, as in Watts, plaintiff has failed to proffer expert medical opinion evidence, or point to any evidence proffered by defendant, to establish that N.P.

Sorrell breached the standard of care in the community.  See Watts, 2009 WL 81285, at

*9; Vale, 673 F. App'x at 116; Milano, 64 F.3d at 95.  Further, defendant has submitted

admissible evidence that establishes that N.P. Sorrell's decision to raise plaintiff's care

level status was made so that plaintiff could be transferred to a facility where he would

have access to the necessary specialists to treat his condition, because Ray Brook is a

care level one facility that does not have access to an ophthalmologist, either at or near

the facility, who will treat federal inmates.  See Dkt. No. 47-11 at 3 ¶ 12.  Moreover, Dr.

Kossoff's expert opinion, as set forth in his detailed report that was based on plaintiff's

medical records, establishes that the February 2018 surgical procedure to reattach the

retina in plaintiff's right eye was successful and that his visual acuity improved as a

result.  See Dkt. No. 47-19 at 2-3.  Dr. Kossoff also points out that the medical evidence

of record does not indicate that the period between when plaintiff began expressing

concerns about his vision following his November 25, 2017 fall during basketball, and

his February 26, 2018 surgery, resulted in any decrease in the effectiveness of the

surgery or any long-term injury whatsoever.  See id. at 4.  Indeed, plaintiff's medical

records indicate that the visual acuity in plaintiff's right eye increased from at least

between 20/100 or 20/200 pre-surgery, to 20/80 post-surgery.  Dkt. No. 49-9 at 2; Dkt.

No. 48-11 at 4, 5.  Thus, defendant's admissible medical evidence, accompanied with

the expert medical opinion evidence of Dr. Kossoff, establishes that plaintiff did not

suffer any injury as a result of the delay between his first complaints of ocular issues

and his retinal reattachment surgery.

In addition, although not raised by either party, once N.P. Sorrell changed

plaintiff's care level status on December 12, 2017—shortly after plaintiff's November 28,

2017 visit—plaintiff's medical care was in the hands of other BOP personnel and any delay that resulted from their actions may not be attributed to N.P. Sorrell's actions.  In any event, although plaintiff characterizes his condition as requiring "emergency" care, Dkt. No. 1-1 at 4 ¶ 13, the medical evidence of record is devoid of any such characterization by plaintiff's treating medical professionals, and is controverted by Dr. Kossoff's opinion that the time between plaintiff's November 28, 2017 examination and his February 26, 2018 surgery did impact the efficacy of the retinal reattachment procedure or result in long-term injury to plaintiff's eye sight.  See Dkt. No. 47-19 at 4. Thus, based on the foregoing, insofar as the Court finds that plaintiff exhausted his administrative remedies as to this claim, the undersigned recommends granting defendant's motion for summary judgment on the merits and dismissing plaintiff's FTCA claim based on N.P. Sorrell's alleged negligent delay in treatment.


## VI. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 47) be **GRANTED IN ITS ENTIRETY**, and it is further

**RECOMMENDED**, that plaintiff's Complaint (Dkt. No. 1) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72.[6]

Dated: June 29, 2021
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[6] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).